HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RUDY ST. GERMAIN, et al.,

      Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, et al.,

      Defendants.

CASE NO. C13-945RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion for a temporary restraining order ("TRO").  Although Plaintiffs requested oral argument, the court finds that oral argument is not necessary.  As the court will discuss later, oral argument is also not practical in light of Plaintiffs' delay in bringing this motion.  For the reasons stated herein, the court DENIES the motion.  Dkt. # 4.

## II.  BACKGROUND

Plaintiffs Rudy St. Germain and Michelle Roberts are members of the federally-recognized Nooksack Indian Tribe of Washington (the "Tribe").  They are also members of the Tribe's eight-person Tribal Council.  Mr. St. Germain is the Council Secretary.

Plaintiffs are also among approximately 300 Nooksack members whom the Tribe may soon strip of their Nooksack membership, or "disenroll."  For context, the court summarizes the disenrollment dispute as Plaintiffs describe it in their complaint.  No one should construe the court's description as findings of fact.  Beginning in late 2012,

ORDER – 1

1   various members of the Tribe, including Council Chairman Robert Kelly and Enrollment

2   Officer Roy Bailey, questioned the Nooksack ancestry of certain members.  Those initial

3   questions led to an investigation that determined that two ancestors from whom about

4   300 current Nooksack members claim descent did not have Nooksack ancestry.  That, in

5   turn, led the Tribal Council in February 2013 to pass Resolution No. 13-02, which

6   commenced disenrollment proceedings.  So far as the record reveals, the disenrollment

7   proceedings have not yet resulted in any disenrollments.

8           Just a few weeks later, on March 1, the Council passed Resolution No. 13-38,

9   which commenced proceedings to amend the Tribe's Constitution to remove a clause that

10   grants membership in the Tribe to "[a]ny person who possesses at least one-fourth (1/4)

11   degree Indian blood and who can prove Nooksack ancestry to any degree."  Nooksack

12   Const., Art. II, § 1(H).[1]  According to Plaintiffs, the disenrollment proceedings and

13   constitutional amendment, if successful, would not only strip them (and 300 others) of

14   Nooksack membership, it would eliminate the only provision of the Tribe's Constitution

15   that would give them an alternative basis to claim membership in the Tribe.

16           The Tribe's Constitution requires amendments to be approved "in an election

17   called for that purpose by the Secretary of the [Department of] the Interior . . . ."

18   Nooksack Const., Art. X.  That clause acknowledges § 16 of the Indian Reorganization

19   Act of 1934.  25 U.S.C. § 476.  That section of the Reorganization Act, which Congress

20   amended in 1988, requires the Interior Secretary to conduct elections for tribes who wish

21   to adopt or amend their constitutions or bylaws.  The so-called "Secretarial elections" that

22   the Reorganization Act authorizes are elections that the federal government conducts, but

23   in which only specially registered tribal voters may participate.  Part 81 of Title 25 of the

24   Code of Federal Regulations contains detailed provisions governing Secretarial elections.

25   Among them is a provision requiring the head of the local Bureau of Indian Affairs

---

[1] The court relies on the version of the Nooksack Constitution at Exhibit B to Mr. St. Germain's declaration.  Dkt. # 17.

ORDER – 2

("BIA") office to serve as the head of an election board that is responsible for setting an election timetable, sending out voter registration forms, and otherwise conducting the election.  25 C.F.R. § 81.8.  The court will consider the Reorganization Act and Secretarial elections in more detail in its later analysis.

On March 20, after the Tribal Council delivered Resolution No. 13-38 to the Puget Sound Agency of the BIA, the BIA (through its Northwest Regional Director) authorized Judith Joseph, the Superintendent of the Puget Sound Agency, to "call and conduct" a Secretarial election on the proposed amendment to the Tribe's Constitution.  Galanda Decl. (Dkt. # 5), Ex. F.

On April 25, Ms. Joseph, having assumed her role as chair of the Secretarial election board comprised of herself and four members of the Tribe, issued a notice of election.  Doucette Decl. (Dkt. # 16), Ex. A.  The notice declared that Ms. Joseph mailed it to all members of the Tribe of voting age, although Plaintiffs present evidence that at least a few members of the Tribe did not receive the notice.  The notice set an election date of June 21 and announced a series of deadlines for election-related submissions.  In particular, it required all Tribe members who wished to vote to complete a registration form and return it so that it was received at the Puget Sound Agency no later than 4:30 p.m. on May 10.  The notice promised to post a list of registered voters at various locations and the Tribe's website no later than May 14.  It required any challenge to the registration list to be received no later than June 4.  The notice explained that the election would be conducted entirely by mail (or by hand-delivery of ballots to the Puget Sound Agency), and that a ballot would have to be received at the Puget Sound Agency no later than 4:30 p.m. on June 21 to be valid.  Election results are to be posted on June 25.

True to its promise, the election board posted a list of approximately 800 registered voters.  No evidence suggests that it did so later than May 14.  Plaintiffs have

ORDER – 3

1
2

provided evidence that some eligible voters unsuccessfully challenged their exclusion
from the list of registered voters.

3
4
5

On at least two occasions in May, Plaintiffs wrote to the Secretary requesting that
she stop what they viewed as an unlawful election. On May 24, counsel for the Secretary
wrote Plaintiffs to inform them that the election would go on as scheduled.

6
7
8
9
10

On May 31, Plaintiffs sued Ms. Joseph, the BIA, Interior Secretary Sally Jewell,
and various other federal officials on May 31. They then waited until the afternoon of
June 17 to file their motion for a TRO. The relief they request is straightforward: they
want to court to enjoin Defendants from "conducting the Secretarial Election set for June
21 . . . ." Prop. Ord., Dkt. # 4-1.

11

### III.  ANALYSIS

12
13
14
15
16
17
18
19
20
21
22
23

The "standard for issuing a temporary restraining order is essentially the same as
that for issuing a preliminary injunction." *Beaty v. Brewer*, 2011 U.S. App. LEXIS
11391, at \*8 (9th Cir. May 25, 2011). The primary difference is that a court can issue a
TRO without notice to the adverse party in certain circumstances. Fed. R. Civ. P.
65(b)(1)(A). Putting aside concerns about notice to the non-moving party, the court may
issue a TRO where a party establishes (1) a likelihood of success on the merits, (2) that it
is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the
balance of hardships tips in its favor, and (4) that the public interest favors an injunction.
*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). A party can
also satisfy the first and third elements of the test by raising serious questions going to the
merits of its case and a balance of hardships that tips sharply in its favor. *Alliance for the
Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131. (9th Cir. 2011).

24
25
26

In this case, Plaintiffs gave Defendants notice of their motion. Nonetheless, they
requested that the court rule before the end of voting on June 21, giving Defendants
scarcely any time to prepare a response. To accommodate the court's pre-existing

27
28

ORDER – 4

1   commitments at the end of this week, Defendants agreed to provide a response in fewer

2   than 40 hours.  The court appreciates Defendants' willingness to work quickly.[2]  The

3   court also acknowledges that there is no apparent reason that Plaintiffs waited until June

4   17 to seek injunctive relief.  They have known about the election since the end of April,

5   and have known since no later than May 24 that the Secretary would not accede to their

6   demand to stop the election.  Their decision to wait for 24 days (and 4 days before the

7   end of voting) to bring their motion has made an already difficult case much more

8   difficult.  Plaintiffs offer no explanation for their decision, whereas Defendants suggest

9   they made it to gain a tactical advantage.  If so, Plaintiffs will be disappointed.

10  Ultimately, Plaintiffs will neither gain an advantage nor suffer consequences as a result of

11  their decision to delay their motion, nor will Defendants.  The judicial process, however,

12  suffers greatly when a party manufactures an "emergency" necessitating a ruling on short

13  notice.  The complex issues that this case raises deserve more than two days of judicial

14  deliberation.  As the parties will see, the court has in several instances bypassed questions

15  of law merely by assuming that their answers favor Plaintiffs.

16  **A.      Plaintiffs Are Unlikely to Succeed on the Merits.**

17          Plaintiff advance two substantive claims in support of their motion: that the

18  Secretarial election violates the Reorganization Act, and that it violates the

19  Administrative Procedures Act (5 U.S.C. §§ 701-706, "APA").  The analysis of each

20  claim depends on an understanding of the role that the Reorganization Act gives the

21  Secretary in conducting Secretarial elections.

22          **1.      The Reorganization Act Requires Pre- and Post-Election Legal Review,
                   But It Does Not Require Pre- and Post-Election Judicial Review.**

23

24          The Reorganization Act creates two periods in which the Secretary must review a

25  proposed constitutional amendment to determine if it complies with applicable laws.  The

26  ---

[2] The court has not considered the reply brief that Plaintiffs filed this afternoon.  The court's

27  local rules prohibit a reply brief on a motion for a TRO.  Local Rules W.D. Wash. LCR 65(b)(5).

ORDER – 5

28

1   Act mandates that the Secretary "call and hold" a Secretarial election "within ninety days

2   after receipt of a tribal request for election to ratify an amendment to the constitution and

3   bylaws." 25 U.S.C. § 476(c)(1)(B). During that 90-day period, the Act directs the

4   Secretary to both "provide such technical advice and assistance as may be requested by

5   the tribe or as the Secretary determines may be needed," and to "review the final draft of

6   the constitution and bylaws, or amendments thereto, to determine if any provision therein

7   is contrary to applicable laws." 25 U.S.C. § 476(c)(2)(A)-(B). The Act also, however,

8   calls for a second legal review if the election results in the adoption of a constitution or

9   amendments. 25 U.S.C. § 476(d)(1). The Secretary must approve the constitution or

10  amendments within 45 days after the election "unless the Secretary finds that the

11  proposed constitution and bylaws or any amendments are contrary to applicable law." *Id.*

12  Federal regulations provide a timetable for post-election challenges. 25 C.F.R. § 81.22.

13  If the Secretary "does not approve or disapprove" the amendments within 45 days after

14  the election, "the Secretary's approval shall be considered as given." 25 U.S.C.

15  § 476(d)(2). The Act also creates a right of judicial review, declaring that "[a]ctions to

16  enforce the provisions of this section may be brought in the appropriate Federal district

17  court." *Id.*[3]

18      In Defendants' view, the Act makes the Secretary's initial decision to call and hold

19  an election mandatory and non-discretionary, rendering any pre-election legal review an

20  illusory requirement. The only authority they cite for that proposition is a district court

21

22  [3] Relying on *Kickapoo Tribe v. Lujan*, 728 F. Supp. 791 (D.D.C. 1990), Defendants argue that
    only a tribe, not individual tribe members, may invoke judicial review via the Reorganization

23  Act. In *Kickapoo Tribe*, however, the court ruled only that a related tribe, whose members had
    no right to vote in the Secretarial election at issue, did not have statutory standing. *Id.* at 793-95.

24  Defendants cite no authority that would prohibit members of the tribe eligible to vote in a
    Secretarial election from invoking 476 U.S.C. § 476(d)(2), and the court is aware of none. For

25  purposes of this order only, the court assumes that Plaintiffs have statutory standing. Other
    courts have recognized individual tribe members' Reorganization Act claims without considering

26  their standing. *E.g.*, *Thomas v. United States*, 189 F.3d 662, 665 (7th Cir. 1999). Defendants do
    not raise a colorable argument that Plaintiffs lack a sufficiently concrete injury to claim standing

27  under Article III of the United States Constitution.

    ORDER – 6

28

1
2
3
4
5
6

decision issued before Congress amended the Reorganization Act.  Indeed, it was that decision, *Coyote Valley Band of Pomo Indians v. United States*, 639 F. Supp. 166 (E.D. Cal. 1986), that prompted Congress to amend the Act.  T. Joranko & M. Van Norman, *Indian Self-Determination at Bay: Secretarial Authority to Disapprove Tribal Constitutional Amendments*, 29 Gonz. L. Rev. 81 (1993); *see also Thomas v. United States*, 141 F. Supp. 2d 1185, 1197 (W.D. Wisc. 2001).

7
8
9
10
11
12
13
14
15

The court cannot overlook that the Reorganization Act, as amended, requires the Secretary to determine if a constitutional amendment is "contrary to applicable laws" both before the election and after the election.  25 U.S.C. § 476(c)(2)(B) & § 476(d)(1). This review is not necessarily redundant.  For example, regulations permit eligible voters excluded from the list of registered voters to file pre-election challenges.  25 C.F.R. § 81.13.  The election board must decide those challenges very quickly, and its decisions are "final" and unreviewable in advance of the election.  *Id.*  At least one court has held, however, that these "final" decisions are reviewable in the 45-day post-election period. *Shakopee Mdewakanton Sioux Cmty. v. Babbitt*, 107 F.3d 667, 671 (8th Cir. 1997).

16
17
18
19
20
21
22

Nonetheless, given the Reorganization Act's two periods of legal review, Defendants raise legitimate questions about whether it is appropriate to bring a legal challenge to alleged inadequacies in the Secretary's pre-election review when post-election review is available.  There is a colorable argument, at least, that a challenge to the legality of a constitutional amendment that voters might reject at the polls is not ripe for a court's consideration.  Solely for purposes of this order, the court assumes that the Reorganization Act creates a right to challenge the Secretary's pre-election legal review.[4]

23
24
25
26
27
28

---

[4] In this case, it is unclear whether the Secretary determined in advance of the election whether the proposed amendment complies with "applicable laws."  The Secretary's memo calling for an election merely states that she "completed [her] technical review of" the proposed amendment. Galanda Decl. (Dkt. # 5), Ex. F.  The court assumes for purposes of this order that the Secretary's "technical review" comprised a determination that the proposed amendment complied with applicable laws, or that the Secretary conducted no legal review, and that decision is equivalent to a determination that the proposed amendment complied with actual laws.

ORDER – 7

1   The court also assumes for purposes of this order that the Secretary's pre-election

2   decision that a proposed amendment complies with "applicable laws" is a decision

3   subject to an APA challenge.  It is more likely that most if not all of Plaintiffs' challenges

4   are premature, but the court addresses them nonetheless.

5       But assuming the availability of a pre-election legal challenge is only part of the

6   story.  A plaintiff seeking injunctive relief must prove that she has no adequate remedy at

7   law. *Schroeder v. United States*, 569 F.3d 956, 963 (9th Cir. 2009).  Plaintiffs have

8   scarcely acknowledged the availability of post-election legal review, and they have made

9   no effort to explain why that review is not an adequate remedy for them.  That

10  explanation is important.  Although Plaintiffs do not acknowledge it, they brought this

11  motion much too late to stop the election.  The election has been ongoing for weeks, and

12  it is likely that many, if not most, of the votes were cast before Plaintiffs moved for relief.

13  It would be extraordinary for a court to intervene in an ongoing election under any

14  circumstances.  In the circumstances this case presents, there is no indication that it is

15  necessary to intervene to stop voting.  Plaintiffs do not explain what they would gain

16  from having the court end voting that they could not gain from a post-election legal

17  challenge.  The only act remaining for the Secretary to complete in advance of the post-

18  election legal review period is to count the ballots and announce a preliminary result.  25

19  C.F.R. §§ 81.21, 81.23(a).  The court assumes, again solely for purposes of this order,

20  that the announcement of a result would cause harm that post-election remedies cannot

21  adequately redress.  The court further assumes that Plaintiffs are requesting not only that

22  the court stop members of the Tribe from voting, but that it also stop the Secretary from

23  announcing the preliminary result of the election.  Plaintiffs have articulated no reason

24  for the court to stop voting, and the court now explains why it will not prevent the

25  Secretary from counting votes.

26

27

ORDER – 8

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 2.  Plaintiffs Are Not Likely to Succeed in Proving that The Proposed Amendment Violates "Applicable Laws" Within the Meaning of the Reorganization Act.

Although the codified portion of the Reorganization Act does not explain what it means by "applicable laws," the 1988 bill that Congress enacted explains that "applicable laws" are "any treaty, Executive order or Act of Congress or any final decision of the Federal Courts which are applicable to the tribe, and any other laws which are applicable to the tribe pursuant to an Act of Congress or by any final decision of the Federal courts." *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1264 (D.C. Cir. 2008) (quoting Act of Nov. 1, 1988, Pub. L. No. 100-581, § 102(1).  The Secretary's sole task, therefore, in satisfying her legal review obligations under the Act, is to determine if the proposed amendment itself violates these "applicable laws."[5]

Plaintiffs insist that the proposed amendment violates applicable laws because of its evident racial animus.  The actions of the Tribal Council, they contend, leave no doubt that it is acting to exclude about 300 members for reasons of racial purity.  For purposes of this motion, the court need not dispute Plaintiffs' characterization of the amendment or of the Tribal Council's motivation for proposing it.  What matters for purposes of this order is that there is no "applicable law" that makes it unlawful for the Nooksack Tribe to define its membership by race or ancestry.

Plaintiffs claim that the proposed amendment denies them equal protection of the laws.  In invoking "equal protection," they cannot invoke the Fourteenth Amendment of the United States Constitution, which does not apply to the Tribe.  *Trans-Canada Enters., Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474, 477 (9th Cir. 1980); *Santa Clara Pueblo*, 436 U.S. at 56 & n.7.  Instead, they rely on the Indian Civil Rights Act (25 U.S.C.

---

[5] Much of the evidence Plaintiffs have put before the court goes well beyond the scope of the Secretary's pre-election legal review.  Plaintiffs offer evidence, for example, that Tribal Council members sent letters and other material urging voters to vote in favor of the amendment, but sent those letters only to the members who did not face disenrollment.  They offer much more evidence revealing that the election and the ongoing disenrollment proceedings are the subject of intense debate and strong emotions among the members of the Tribe.  None of this evidence pertains to whether the amendment itself complies with applicable laws.

ORDER – 9

1    §§ 1301-03, "ICRA").  Among other things, the ICRA imposes on tribes several

2    obligations that are "similar, but not identical," to those found in the Bill of Rights.

3    *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56-57 (1978); 25 U.S.C. § 1302(a).

4    Among them is a prohibition on "deny[ing] to any person within [the tribe's] jurisdiction

5    the equal protection of its laws . . . ."  25 U.S.C. § 1302(a)(8).  Beyond a narrow

6    exception for suits akin to a petition for writ of habeas corpus, ICRA does not create a

7    cause of action in the federal courts.  *Santa Clara Pueblo*, 436 U.S. at 59 ("[W]e

8    conclude that suits against the tribe under ICRA are barred by its sovereign immunity

9    from suit.").  Plaintiff seeks to sidestep this bar on the courthouse door by arguing that

10   while they cannot enforce ICRA directly, they can require the Defendants to enforce

11   ICRA because it is one of the "applicable laws" with which a proposed constitutional

12   amendment must comply via the Reorganization Act.  The court assumes without

13   deciding that the law permits Plaintiffs' approach.  *See Santa Clara Pueblo*, 436 U.S. at

14   66 n.22.

15          What the law does not permit is the conclusion that ICRA's guarantee of equal

16   protection is a bar to a constitutional amendment defining a tribe's membership.  "A

17   tribe's right to define its own membership for tribal purposes has long been recognized as

18   central to its existence as an independent political community."  *Santa Clara Pueblo*, 436

19   U.S. at 72 n.32.  Plaintiffs are members of the Nooksack Tribe by virtue of the

20   membership requirements currently stated in the Tribe's Constitution, all of which define

21   membership by ancestry.  The proposed constitutional amendment, which alters those

22   ancestry-based requirements, is no more unlawful than the original requirements.  Put

23   simply, neither ICRA nor any other law prohibits a tribe from using race or ancestry in

24   defining its membership.  Neither the court nor the Secretary can recognize tribal

25   sovereignty while abridging the Tribe's right to define its membership.  It is possible that

26   a particular method of disenrollment might violate the law, but a bare constitutional

27

28   ORDER – 10

1 amendment redefining membership is not unlawful.[6]  Because Plaintiffs have not

2 identified an "applicable law" with which the proposed constitutional amendment is out

3 of compliance, they are not likely to succeed on the merits of their claim invoking the

4 Reorganization Act.

5        **3.      Plaintiffs Are Not Likely to Succeed on Their APA Claim.**

6       Turning to the APA, Plaintiffs fare no better.  The APA does not permit plenary

7 review of an agency decision. With certain exceptions not applicable here, the court can

8 set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or

9 otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

10       Plaintiffs first contend that the Secretary's decision to conduct an election ignores

11 the standards contained in what Plaintiffs refer to as the "BIA Handbook."  According to

12 them, the "Handbook" contains binding rules for the approval or disapproval of tribal

13 constitutions and amendments.  Plaintiffs offer nothing to support their claims about the

14 "Handbook."  The "Handbook" that they have submitted in the record is a June 1987

15 document that contains "Review Guidelines" for constitutions and amendments.  Galanda

16 Decl. (Dkt. # 5), Ex. G.  Plaintiffs offer no evidence that the BIA continues to use this

17 "Handbook," which was drafted prior to the 1988 amendments to the Reorganization Act.

18 Plaintiffs offer no evidence that if the "Handbook" were still in use, it contains

19 regulations that are binding on the Secretary.  Plaintiffs point to no court anywhere that

20 has construed the "Handbook" as a source of binding authority.[7]  And finally, even

21

22 [6] Even in federal constitutional law, equal protection applies only to the extent the Constitution
does not specify otherwise.  Article I, Section Two of the Constitution, for example, limits
presidential eligibility to "natural born" citizens.  Were Congress to pass a law barring men from

23 owning property, that law would violate the Equal Protection Clause.  Were three quarters of the
states to ratify an amendment to the Constitution to prohibit men from owning property, the

24 Equal Protection Clause would not apply.  Plaintiffs offer no authority for the notion that the
court should treat the Tribe's Constitution differently.

25

26 [7] Plaintiffs cite a single district court decision, suggesting that that court relied on the
"Handbook" as at least an aid to interpreting the Secretary's obligations.  Plaintiffs did not reveal
that that court considered an entirely different BIA "Handbook" addressing entirely different

27 subject matter.

ORDER – 11

28

1

2

3

4

5

ignoring these prerequisites, Plaintiffs do not establish that the proposed constitutional amendment violates any of the guidelines in the "Handbook."  They erroneously contend, for example, that the amendment would run afoul of a prohibition on retroactive disenrollment.  Nothing in the proposed amendment would disenroll anyone retroactively.  It

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

The APA does, however, require the Secretary to conduct the election in accordance with procedures stated in the Code of Federal Regulations.  Plaintiffs point to several alleged violations of those regulations.  First, they contend that the election board erred in setting a June 4 deadline for receipt of challenges from Tribe members who contended they were erroneously left off the list of eligible voters that the board posted on May 14.  They contend that 25 C.F.R. § 81.13 required that deadline to be 10 days prior to the election, on June 11.  They are mistaken.  The regulation they cite merely requires the Secretary to "rule on all claims no later than ten days before the election," and mandates that "[a]ny claim not presented at least ten days before the election shall be disallowed."  25 C.F.R. § 81.13.  At most, the regulation gives the board the discretion to consider challenges up to ten days before the election.  It was not an abuse of discretion to impose a deadline seven days sooner.  Nor is the court persuaded by evidence that, as of the date they filed their declarations, a few eligible voters had not received responses to their registration challenges.  The post-election review process is an adequate forum for addressing those challenges.

21

22

23

24

25

Plaintiffs similarly misconstrue 25 C.F.R. § 81.19, which requires the board to provide an absentee ballot to any "registered and otherwise eligible voter" who requests a ballot.  Plaintiffs provide no evidence that any registered voter was denied a ballot.  Instead, they provide evidence that voters who the board determined did not register to vote were not provided ballots.  Section 81.19 does not address registration decisions.

26

27

28

ORDER – 12

1   Section 81.13, by contrast, makes the board's decision on pre-election registration

2   challenges final.

3          Plaintiffs complain that the period between the election board's April 25 election

4   notice (which eligible voters would not have received in the mail until at least the next

5   day) and the May 10 registration deadline was too short, particularly for Tribe members

6   who live in Canada.  No regulation governs the length of the voter registration period.

7          Plaintiffs also contend that the board erred by calling for an all-mail election.

8   They do not explain, however, how the court can overlook 25 C.F.R. § 81.18(c), which

9   authorizes all-mail elections.

10         Finally, Plaintiffs contend that the Secretary erred when she concluded that

11  Resolution No. 13-38 was a proper call for a Secretarial election.  Plaintiffs provide

12  evidence that the Tribal Council enacted that resolution during an executive session that

13  was not part of a public meeting, and thus violated the Tribe's Bylaws.  Whatever merits

14  Plaintiffs' allegations have as a matter of tribal law, they do not pass muster as a matter

15  of federal law.  The Reorganization Act requires only a "tribal request" to initiate the

16  Secretarial election process.  25 U.S.C. § 476(c)(1)(B).  The accompanying regulation

17  specifies that the Secretary must call an election "on the adoption of amendments to a

18  constitution and bylaws or a charter when requested pursuant to the amendment article of

19  those documents."  25 C.F.R. § 81.5.  The Tribe's Constitution, in turn, requires only a

20  "request of the tribal council" to initiate a Secretarial election.  Nooksack Const., Art. X.

21  In this case, there is no dispute that a majority of the Tribal Council voted to request a

22  Secretarial election.  The Tribe's Constitution does not require that request to come as a

23  result of a particular type of meeting, and the court will not impose that requirement.

24  Plaintiffs' reliance on *Milam v. Dep't of Interior*, 10 ILR 3013 (D.D.C. 1982) is

25  misplaced.  *Milam* merely held that where there was no tribal remedy to determine which

26  of two competing factions was authorized to represent a tribe, the Secretary could look to

27  

ORDER – 13

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

tribal law.  *Id.* at 3015.  Appellate courts considering *Milam* have limited it to its unusual circumstances.  *E.g.*, *Nero v. Cherokee Nation*, 892 F.2d 1457, 1465 (10th Cir. 1989); *Goodface v. Grassrope*, 703 F.2d 335, 339 (8th Cir. 1983).

**B.      The Remaining Injunctive Relief Factors Do Not Favor Plaintiffs' Pre-Election Challenge.**

Because Plaintiffs have not shown a likelihood of success on the merits of their claims, or even serious questions going to the merits, it is not strictly necessary that the court address the remaining injunction factors.  The court nonetheless addresses them briefly.

Plaintiffs have established that they are likely to suffer irreparable harm if the amendment becomes law and if the Tribe continues its disenrollment efforts.  Plaintiffs have given the court no means to assess the likelihood that the amendment will pass. They have also given the court no reason to believe that they lack an adequate post-election remedy.  Thus, while Plaintiffs have established a possibility of irreparable harm, the court has little basis on this record to conclude that irreparable harm is likely.

For the same reasons, the court is unable to conclude that the balance of hardships tips in Plaintiffs' favor.  The hardship to the Secretary of halting the election is likely minimal, or at least there is no evidence to the contrary.  The hardship to the Tribe, and to the delicate balance of sovereignty between the Tribe and the federal government, is more weighty.  The court cannot ignore the hardship inherent in federal interference with an election that affects only the Tribe, and only as to an issue at the core of its sovereign power.  Particularly where it is possible that Plaintiffs will face no hardship at all (if the amendment is not ratified), the court cannot conclude that the balance of hardships favors Plaintiffs.

Finally, the public interest favors minimizing federal interference in tribal elections.  The Reorganization Act gives the federal government a role in certain tribal elections, but the Act does not serve as carte blanche to micromanage elections that

ORDER – 14

1 impact only tribal matters.  Particularly where a post-election challenge remains

2 available, the public interest does not favor Plaintiffs.

3         **IV. CONCLUSION**

4    For the reasons stated above, the court DENIES Plaintiffs' motion for a temporary

5 restraining order.  Dkt. # 4.

6    Dated this 19th day of June, 2013.

7

8

9           The Honorable Richard A. Jones

10          United States District Court Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORDER – 15

28